IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, | ) | |
| GULF RESTORATION NETWORK, INC., | ) | |
| and SAVE THE MANATEE CLUB, INC., | ) | |
| | ) | CASE NO. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | COMPLAINT FOR DECLARATORY |
| | ) | AND INJUNCTIVE RELIEF |
| BP, P.L.C., BP AMERICA, INC., | ) | |
| BP EXPLORATION AND | ) | |
| PRODUCTION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

_____

## COMPLAINT
_____


## INTRODUCTION

1.      As provided by Section 11(g)(1)(A) of the Endangered Species Act ("ESA" or "the Act"), 16 U.S.C. § 1540(g)(1)(A) (2010), this action challenges the ongoing unlawful "take" of federally listed endangered and threatened species in the Gulf of Mexico by BP America, Inc., BP, p.l.c., and BP Exploration and Production, Inc. (collectively "BP" or "Defendants") resulting

from their release of crude oil and subsequent cleanup efforts following the April 20, 2010 Deepwater Horizon blowout.

2.      Plaintiffs Defenders of Wildlife ("Defenders"), Gulf Restoration Network, Inc. ("GRN"), and Save the Manatee Club, Inc. ("SMC") (collectively "Plaintiffs") seek injunctive and declaratory relief to remedy the ongoing violations of federal law.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper in this Court pursuant to 16 U.S.C. § 1540(g) (the ESA citizen suit provision), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

4.      Pursuant to 16 U.S.C. § 1540(g), BP was provided with written notice of the ongoing take of threatened and endangered species in violation of the ESA as a result of the Deepwater Horizon blowout, oil spill and subsequent cleanup efforts, on May 25, 2010.

5.      Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) (the ESA citizen suit provision), because Defendants' ESA violations are occurring in Louisiana and its territorial waters, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims take place in Louisiana and its territorial waters.  The spill threatens the unique coastal resources of the State of Louisiana, including the Breton National Wildlife Refuge in St. Bernard Parish, Louisiana, which contains 18,273 acres of wildlife habitat for seabirds, shorebirds and sea turtles.

## PARTIES

### A.  Plaintiffs

6.      Plaintiff Defenders of Wildlife is a national nonprofit organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities.

1

Based in Washington, D.C., and with offices spanning from Florida to Alaska, Defenders has over 415,000 members across the nation, including over 34,000 members from the states of Louisiana, Mississippi, Alabama, and Florida.   Defenders is a leader in the conservation community's efforts to protect and recover threatened and endangered species, including sea turtles, whales, birds, and manatees impacted by the Deepwater Horizon spill.

7.     Defenders' members regularly use, enjoy, and benefit from healthy coastal and marine ecosystems and the presence of diverse coastal and marine life, including the threatened and endangered sea turtles, whales, birds, manatees and other coastal and marine species that are likely to be killed, injured, or disturbed by the Deepwater Horizon oil spill and subsequent clean-up operations.   Defenders' members derive recreational, aesthetic, economic and scientific benefits from the natural environment of the Gulf of Mexico, including the threatened and endangered species that reside in Gulf habitats.   Defenders' staff and members have and will continue to regularly observe, photograph, study and otherwise enjoy threatened and endangered Gulf species, including sea turtles, sperm whales, manatees, piping plovers, and other endangered and threatened species that have been and will continue to be taken in violation of the ESA.   Defenders' members and staff also recreate in and otherwise enjoy the coastal and marine habitats of the Gulf's threatened and endangered species.   The interests of Defenders' members in protecting, observing and studying endangered and threatened species in the Gulf are directly harmed by the Deepwater Horizon blowout, oil spill, and subsequent cleanup efforts.

8.     Plaintiff Gulf Restoration Network, Inc. is a non-profit corporation formed under the laws of the state of Louisiana with its principal place of business in New Orleans, Louisiana.   GRN is a network of environmental, social justice, and citizens groups and individuals committed to uniting and empowering people to protect and restore the natural resources of the Gulf of Mexico

2

region for future generations.  GRN currently has 40 local, regional, and state-based group members, including groups from Louisiana.  GRN also has 7583 individual members who hail from the Gulf States, including 5423 members in Louisiana.  GRN, its member groups, and its individual members are closely involved in protecting endangered and threatened species in the Gulf of Mexico, including sea turtles, whales, birds, and manatees.  GRN members derive significant benefit from healthy Gulf ecosystems and the endangered and threatened species that reside in them, including for recreation, aesthetic enjoyment and scientific study.  The interests of GRN's members in protecting, observing and studying endangered and threatened species in the Gulf are directly harmed by the Deepwater Horizon blowout, oil spill, and subsequent cleanup efforts.

9.      Plaintiff Save the Manatee Club, Inc. is a non-profit corporation formed under the laws of the State of Florida with its principal place of business in Maitland, Florida.  SMC has approximately 40,000 members, including more than 3000 members in Gulf states from Texas to Florida.  SMC and its members are dedicated to the protection and recovery of endangered manatees and work to (i) protect and restore habitat, (ii) reduce manatee harassment, injuries, and deaths from human activity, and (iii) advocate for laws and regulations that protect manatees and their habitat.  SMC members derive recreational, aesthetic, and professional benefits from manatees and their aquatic habitats in the Gulf.  SMC seeks to require BP to minimize and correct ongoing environmental damage that has resulted from the Deepwater Horizon spill, and to prevent future spills that would further damage coastal and aquatic ecosystems and their species, including the potential injury, death, and harassment of manatees.  The interests of SMC and its members in protecting, observing and studying endangered manatees in the Gulf are directly harmed by the Deepwater Horizon blowout, oil spill, and subsequent cleanup efforts.

10.     Plaintiffs' members are injured by BP's actions because the Deepwater Horizon explosion, oil spill, and subsequent cleanup efforts are reasonably certain to cause the take of numerous endangered and threatened species, including sea turtles, sperm whales, manatees, and piping plovers in violation of the ESA.  This take includes the death and injury of members of protected species, as well as harassment and harm of members of protected species.  BP's actions harm Plaintiffs' members' interests in both the short-term and long-term, impairing Plaintiffs' members' ability to observe and enjoy healthy wildlife in a healthy Gulf ecosystem.

11.     This Court can remedy Plaintiffs' members' injuries caused by BP by granting the relief requested in this Complaint.

### B.  Defendants

12.     BP, p.l.c. ("BP, p.l.c.") is a public limited company organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.  BP, p.l.c. is one of the three largest integrated energy services companies in the world, with more than 80,000 employees and exploration and production operations in 30 countries.  BP, p.l.c. products are available in more than 100 countries.  BP, p.l.c. is doing business in the State of Louisiana.

13.     BP Exploration and Production, Inc. ("BP Exploration") is a corporation formed under the laws of the State of Delaware and doing business in the State of Louisiana.  BP Exploration is a subsidiary of BP, p.l.c.

14.     BP America, Inc. ("BP America") is a corporation formed under the laws of the State of Delaware and doing business in the State of Louisiana.  BP America is a subsidiary of BP, p.l.c.

15.     BP, p.l.c., BP Exploration, and BP America are hereinafter collectively referred to as "BP" or "Defendants."

## LEGAL BACKGROUND

16.     Congress enacted the ESA, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species. . . ." 16 U.S.C. § 1531(b).

17.     The U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services") are the federal agencies that have been delegated responsibility for administering the ESA.  See 16 U.S.C. §§ 1532(15), 1533, 1536, 1539, 1540; 50 C.F.R. §§ 10.1, 222.101(a), 402.01(b).  FWS maintains jurisdiction over most terrestrial species, and NMFS maintains jurisdiction over most marine species.  See 50 C.F.R. §§ 17.11, 17.12, 223.23(a), 227.4, 402.01(b).

18.     Under the ESA, a species is listed as "endangered" when it is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and listed as "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20).  Once listed, a species is entitled to a number of protections, including prohibitions on harm and harassment and affirmative duties to promote the species' conservation and recovery.

19.     Section 9(a)(1) of the ESA makes it "unlawful for any person subject to the jurisdiction of the United States to" . . . "take any such [endangered] species within the United States or the territorial sea of the United States"  or to "take any such species upon the high seas." 16 U.S.C. §1538(a)(1)(B)–(C).  It is a violation of the ESA for "any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or caused to be committed" any such offense.  Id. § 1538(g).

20.     The ESA defines the term "take" as meaning "to harass, harm, pursue, hunt, shoot wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

21.     The Services have defined the term "harm" to mean "an act which actually kills or injures fish or wildlife.  Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102 (NMFS definition); see also 50 § 17.3 (FWS definition).

22.     The FWS has defined the term "harass" as meaning "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  Id. § 17.3.

23.     NMFS has extended Section 9's prohibitions on take to threatened sea turtles.  See id. § 223.205.

24.     FWS has extended Section 9's prohibitions to most threatened species, including piping plovers.  See id. §§ 17.21, 17.31, 17.44(v).

25.     The prohibitions against take apply equally to persons engaged in activities that are not intended or designed to take species listed under the ESA, but may do so incidentally, unless the take is permitted in limited circumstances pursuant to Sections 7 or 10 of the Act.  See 16 U.S.C. §§ 1536(a), 1539(a)(1)(B).

26.     Section 7(a)(2) of the ESA requires that each Federal agency, in consultation with either the FWS or the NMFS, "insure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification" of such species' designated critical habitat. Id. § 1536(a)(2).

27.      If a federal action is found likely to adversely affect but not likely to jeopardize the continued existence of a threatened or endangered species, the FWS or NMFS will prepare a Biological Opinion specifying: (i) the amount and impact of any incidental take of the species anticipated from the proposed action; (ii) the reasonable and prudent measures necessary or appropriate to minimize the impact of such take; (iii) if a marine mammal is involved, "those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act"; and (iv) the "terms and conditions" the action agency must comply with to implement the foregoing measures. Id. § 1536(b)(4); 50 C.F.R. § 402.14(i). The take of a listed species by a federal agency is authorized only to the extent it is in compliance with such a statement and its terms and conditions.

28.      Section 10 of the ESA grants the Secretaries of the Interior and Commerce, the departments with authority over FWS and NMFS, respectively, limited discretion to permit the take of a listed species if the permitted activity is either "for scientific purposes or to enhance the propagation or survival of the affected species" or "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(A)-(B). The ESA requires that the applicant for such a permit submit a conservation plan and that the public be given an opportunity to comment on the permit application and the conservation plan. Id. § 1539(a)(2)(A)-(B).

## STATEMENT OF FACTS

### A.  BP's Oil Spill and Clean-Up Activities

29.     On April 20, 2010, the Deepwater Horizon offshore drilling rig exploded and caught fire, causing the deaths of 11 workers and resulting in the discharge of millions of gallons of oil into the Gulf of Mexico.

30.     The Deepwater Horizon sank two days after the explosion, and the well it was drilling spewed oil until capped on July 15, 2010.  The Flow Rate Technical Group, a group of scientists from federal agencies and academic institutions, estimate that the Deepwater Horizon well spilled 4.1 million barrels, or 172.2 million gallons, of oil into the Gulf of Mexico before the well was capped.

31.     The cumulative oil-slick footprint from the Deepwater Horizon blowout covered thousands of square miles in the Gulf.

32.     At least 650 miles of Gulf Coast shoreline have been impacted by oil, including more than 380 miles in Louisiana, 110 miles in Mississippi, 75 miles in Alabama, and 90 miles in Florida.

33.     Scientists have also reported large plumes of oil below the sea's surface.  Scientists from Woods Hole Oceanographic Institution documented an undersea oil plume 35 kilometers long, 200 meters thick, and 2 kilometers wide at a depth of approximately 1100 meters.  The Woods Hole team determined that the Deepwater Horizon well was the source of the plume.

34.     Residual oil continues to be observed in Gulf waters and on Gulf beaches and shorelines. On September 10 and 11, 2010, new oil and tar balls contaminated beaches and marshes in Plaquemines Parish, Louisiana, and oil sheen was present on the water surface offshore.  On September 22, 2010, the Shoreline Assessment Team documented tar balls washing ashore at

8

Bon Secour National Wildlife Refuge and oil buried under clean sand on the beach and in nearshore waters.  In some areas of the Gulf coast, the team has documented large tar mats, one to three inches thick.  Additionally, scientists have discovered an extensive layer of oil-laden sediment on the Gulf seafloor.  As of October 13, 2010, 98 miles of Gulf Coast shoreline were still experiencing moderate to heavy oil impacts, and 458 miles of Gulf Coast shoreline were experiencing light to trace oil impacts.

35.     Oceanographer Ian MacDonald from Florida State University testified to the President's National Oil Spill Commission on September 27, 2010 that more than 50% of the total discharge of oil from the Deepwater Horizon blowout remains in the Gulf ecosystem, much of it in coastal and marine sediments.

36.     The volume of oil discharged to the Gulf of Mexico as a result of the Deepwater Horizon blowout dwarfs the approximately 12 million gallons spilled in the 1989 Exxon Valdez accident in Alaska.  The much smaller Exxon Valdez spill produced long-term devastating impacts on the wildlife of Prince William Sound.  Despite cleanup and restoration efforts, oil has persisted on beaches and in the sediments of Prince William Sound for more than twenty years.

### B.  Take of Endangered and Threatened Species

37.     There are least 27 animal species listed as endangered or threatened that utilize habitat in the Gulf.  This list includes reptiles, birds, fish, and marine and land mammals.

38.     On June 29, 2007, the National Marine Fisheries Service issued its Biological Opinion on the effects of the Minerals Management Service's ("MMS")[1] 2007-2012 Five-Year Outer Continental Shelf Oil and Gas Leasing Program in the Central and Western Planning Areas of

---

[1] Subsequent to the Deepwater Horizon blowout, the Minerals Management Service was renamed the Bureau of Ocean Energy Management, Regulation, and Enforcement.  All references to this agency relate to actions taken before the renaming and therefore MMS will be used.

the Gulf of Mexico (hereafter, the "NMFS Biological Opinion").   See Nat'l Oceanic & Atmospheric Admin., Nat'l Marine Fisheries Serv., Se. Reg'l Office, Protected Res. Div., Endangered Species Act-Section 7 Biological Opinion, F/SER32:KPB (June 29, 2007), *available at* http://sero.nmfs.noaa.gov/sf/deepwater_horizon/02611_MMS_Leases_2007-2012.pdf.

39.     As part of its analysis in the Biological Opinion, NMFS relied on MMS's expectation that over the 40-year lifespan of the proposed leases "approximately one major oil spill could occur . . . ." Id. at 78.   To assess the potential impacts on endangered and threatened species from a "major oil spill," NMFS reviewed the effects of the Ixtoc I oil spill which occurred in the western Gulf of Mexico in 1979.  Id.   The Ixtoc I oil spill resulted in the release of an estimated 140 million gallons of oil between June 1979 and March 1980 and, until the Deepwater Horizon disaster, was considered the largest offshore accidental oil spill.

40.     Based on the assumption that "[w]ith new technological advances and oil spill prevention and response plans, a major oil spill in the [Gulf of Mexico] would not likely be as large as Ixtoc I," NMFS used "one-half estimates of the approximate maximum spill area from Ixtoc I to estimate potential impacts from a major oil spill" on endangered and threatened species in the Gulf.  Id.

41.     The amount of oil released from the Deepwater Horizon well exceeds the amount of oil released in the Ixtoc I spill by more than 30 million gallons.

42.     NMFS acknowledged in it Biological Opinion that "[o]il spills are rare events, but they have the potential to be devastating to the listed species in the area affected when they occur." Id. at 77.   NMFS recognized that adverse effects to endangered and threatened species from chronic exposure would persist long after the oil has dispersed.  See id. at 79-80.

10

43.     NMFS did not authorize any anticipated takes resulting from a major oil spill because "those takings . . . would result from an unlawful activity (i.e., oil spills)" and may not lawfully be granted "protective coverage under section 7(o)(2) of the ESA." Id. at 101.

44.     In its exploratory plan, BP stated that it did "not anticipate that any protected species might be incidentally taken during operations proposed in this plan."  BP, Initial Exploration Plan, Mississippi Canyon Block 252 at 10-1 (Feb. 23, 2009).

          i.     Sea Turtles

45.     Five species of threatened or endangered sea turtle use the waters and shores of the Gulf of Mexico at some stage of their development: green (*Chelonia mydas*; Florida colonies are endangered; all others are threatened); hawksbill (*Eretmochelys imbricata*; endangered); leatherback (*Dermochelys coriacea*; endangered); loggerhead (*Caretta caretta*; threatened); and Kemp's ridley (*Lepidochelys kempii*; endangered).

46.     Sea turtles show no avoidance response to oil slicks and will migrate into and through oil contaminated waters to nest and feed.  See NMFS, Oil and Sea Turtles: Biology, Planning and Response 39 (G. Shigenaka, ed. 2003).  Sea turtles rapidly inhale large volumes of air before and after diving which increases their exposure to toxic vapors in oil contaminated waters.  Id. at 40. Exposure to volatile hydrocarbons impairs the olfactory systems of sea turtles and disrupts their ability to navigate during migration. Id. at 43.

47.     Sea turtles of all ages have trouble distinguishing tar balls from food and will ingest anything that appears food-sized.  Id. at 39. Oysters and clams, which are important sea turtle food sources, absorb oil and become toxic as a result of an oil spill.  Ingested oil accumulates in the esophagi and stomachs of sea turtles and results in prolonged exposure to toxins.  Id. at 40. "Tarballs ingested by any age class of sea turtle are likely to have a variety of effects, including

starvation from gut blockage, decreased absorption efficiency, absorption of toxins, effects of general intestinal blockage (such as local necrosis or ulceration), interference with fat metabolism, and buoyancy problems cause by the buildup of fermentation gases (floating prevents turtles from feeding and increases their vulnerability to predators and boats), among others." NMFS Biological Opinion at 73. Heavily oiled areas are often devoid of life following a major oil spill and unable to support sea turtle populations.

48.    May through October is the breeding season for sea turtles in the Gulf of Mexico. Kemp's ridley and loggerhead sea turtles are known to regularly nest on Gulf beaches, and observers have documented small numbers of green turtle and leatherback turtle nests in recent years.

49.    A massive oil spill, like the Deepwater Horizon spill, will reduce sea turtle nesting success and adversely impact the health and survival of embryos and hatchlings. See NMFS Oil and Sea Turtles at 37-38. Adult female sea turtles typically migrate to the nesting beach where they hatched, and, if this beach is oiled, the turtles and their nests face disastrous consequences. Oiled sand does not support the natural processes needed for successful egg incubation. Id. at 38. Oiled sand raises the temperature of nests, which decreases embryo survival rates and skews the male/female ratio of developing embryos. Id. at 44. Oxygen diffusion deep into the nest is critical for normal embryo development, and oiled sand prevents natural gas exchange. Gas exchange occurs at the top half of the sea turtle egg, and, if oil coats this area, the embryo does not receive sufficient oxygen and suffers malformation and death. Id. at 38. Toxins in oil can penetrate the permeable egg and result in malformation of embryos and death. Id. at 37-38. Developing blood vessels are especially vulnerable to oil toxicity, and oil impairs the ability of the blood to carry oxygen.

50.     When sea turtle hatchlings leave nesting beaches and enter Gulf waters, they experience direct oil exposure, contaminated prey and oil impacts on their habitat.  Because of their limited motility, hatchlings aggregate in convergence zones where spilled oil also collects.  See NMFS Oil and Sea Turtles at 38-39.  Tar balls and oil slicks can physically overwhelm hatchlings and make them more vulnerable to predators.  Id.  Oil will clog the beaks and esophagi of hatchlings and cause starvation.  Id.

51.     Turtles are adversely impacted by the effect of oil on sargassum, a brown seaweed found in the Gulf of Mexico.  Floating sargassum mats provide critical habitat for hatchlings and young oceanic-phase turtles, as well as numerous other species.  See NMFS Biological Opinion at 49. Surface oil collects in convergence zones and contaminates sargassum.  Id.

52.     Absorption of inhaled and digested toxins found in oil by juvenile and adult sea turtles can produce long-term chronic health effects.  Id. at 74.  Because sea turtles are a long-lived, slowly maturing species, it can often take many years to observe population level impacts resulting from harm to individuals.

53.     The harmful effects of a major oil spill on Gulf sea turtles were known at the time of the Deepwater Horizon incident.  In NMFS's Biological Opinion on the effects of MMS's leasing program for the Gulf of Mexico, the agency determined that "sea turtles have a high potential to be affected by an oil spill resulting from the proposed lease sales" because of their widespread distribution in the Gulf of Mexico and their use of beaches, "inshore, shelf, and oceanic waters" during different life history stages.  Id. at 74.

54.     NMFS predicted that a major oil spill in the Gulf as a result of MMS's oil and gas leasing program on the Outer Continental Shelf would cause "up to 42 lethal and 111 non-lethal takes of loggerheads; 2 lethal and 7 non-lethal takes of a leatherback sea turtles; 9 lethal and 16 non-

lethal takes of Kemp's ridley sea turtles; [and] 13 lethal and 36 non-lethal takes of green sea turtles." Id. at 101.

55.     On October 14, 2010, the Deepwater Horizon Unified Area Command reported that 605 dead sea turtles and 456 alive but visibly oiled sea turtles have been recovered in the Gulf since the Deepwater Horizon explosion.  Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report (Oct. 14, 2010), *available at* http://www.restorethegulf.gov/fish-wildlife/fish-wildlife-reports.

56.     It is reasonably certain that the release of oil into the Gulf of Mexico as a result the Deepwater Horizon blowout has caused and will continue to cause the take of endangered and threatened sea turtles.

   ii. Whale species

57.     Four endangered whale species reside in the Gulf: blue (*Balaenoptera musculus*); fin (*Balaenoptera physalus*); sei (*Balaenoptera borealis*); and sperm (*Physeter macrocephalus*).

58.     Exposure to crude oil irritates whales' skin and eyes, burns mucous membranes and increases whales' susceptibility to infection.  Exposure to oil fumes causes disorientation and neurological damage.  Exposure to oil also fouls baleen, impairs the animal's ability to eat and ultimately causes starvation.  Other risks to whales from oil exposure include: hypothermia, toxic and secondary organ dysfunction due to oil ingestion, interstitial emphysema due to inhalation of oil droplets and vapor, gastrointestinal ulceration and hemorrhaging due to ingestion of oil during feeding, eye and skin lesions, weight loss due to restricted diet and stress, and behavioral changes.

59.     Blue, fin and sei whales are filter feeders and depend on large volumes of marine invertebrates for sustenance.  When these invertebrates are contaminated by oil, they become a significant avenue of exposure for these species, causing acute and chronic long-term harm.

60.     The sperm whale population in the Gulf of Mexico is small, approximately 1665 individuals, and distinct from sperm whale populations elsewhere in the Atlantic Ocean.  As a result, the species' long-term survival in the Gulf is extremely vulnerable to any disruption of the natural environment.  A 2009 NMFS stock assessment report estimated that the human-caused death of just three sperm whales would jeopardize the species' long-term survival in the Gulf. NMFS, SPERM WHALE (*Physeter macrocephalus*): Northern Gulf of Mexico Stock at 3 (Dec.2009), *available at* http://www.nmfs.noaa.gov/pr/pdfs/sars/ao2009whsp-gmxn.pdf.

61.     Sperm whales in the Gulf aggregate in the deeper waters beyond the continental shelf, especially where depths exceed 3000 feet, and forage over wide geographic areas.  Sperm whales cluster offshore of the Mississippi River Delta and at Mississippi Canyon, known nursery areas for the species and where the Deepwater Horizon blowout occurred.

62.     The harmful effects of a major oil spill on Gulf sperm whales are known to BP and federal regulators.  In NMFS's Biological Opinion on the effects of MMS's leasing program for the Gulf of Mexico, the agency determined that the potential effects to sperm whales from a major oil spill include "physical injury and irritation, respiratory stress from inhalation of toxic fumes, food reduction or contamination, direct ingestion of oil and/or tar, and temporary displacement from preferred habitats."  NMFS Biological Opinion at 76.  Additionally, "[h]ydrocarbons absorbed in the blood stream may accumulate in the brain and liver and result in neurological disorders." Id. at 75.  "Because of the matriarchal social structure of sperm whales, an accidental oil spill affecting sperm whales could potentially affect the whole group in the area,

including adult females, calves, and juveniles of either sex." Id.  NMFS predicted "11 non-lethal takes of sperm whales over the 40-year lifetime of the proposed lease sales." Id. at 101.

63.     On October 14, 2010, the Office of Protected Resources, NOAA Fisheries reported that one dead sperm whale has been recovered in the Gulf since the Deepwater Horizon explosion. NOAA Fisheries, Office of Protected Res., Sea Turtles, Dolphins, and Whales and the Gulf of Mexico Oil Spill (Oct. 14, 2010), *available at* http://www.nmfs.noaa.gov/pr/health/oilspill.htm. On June 16, 2010, the Deepwater Horizon Unified Area Command noted in a press release that, in addition to the discovery of a single dead sperm whale, its Wildlife Branch had received numerous reports of sperm whales swimming in oil.   Deepwater Horizon Unified Area Command, NOAA Conducts Tests to Determine Fate of Whale Found Dead in Gulf of Mexico, *available at* http://www.restorethegulf.gov/release/2010/06/16/noaa-conducts-tests-determine-fate-whale-found-dead-gulf-mexico.   Other reports indicate that a second sperm whale, a juvenile, was found dead in Plaquemines Parish, Louisiana, on September 12, 2010. Plaquemines Parish Government Homepage, http://www.plaqueminesparish.com (last visited Oct. 20, 2010).

64.     It is reasonably certain that the release of oil into the Gulf of Mexico as a result of the Deepwater Horizon blowout has caused and will continue to cause the take of endangered whales.

       iii.   <u>Birds</u>

65.     The coast of the Gulf of Mexico is a critical wintering ground for the piping plover (*Charadrius melodus*; Great Lakes population endangered, all others threatened).  The Gulf coast also provides an important stopover point for numerous species of endangered or threatened migratory birds.

66.     The most visible impact of an oil spill on birds is the oiling of the feathers, which reduces the birds' buoyancy and insulation.  Oiled birds suffer from hypothermia and drowning.

67.     Toxins from oil cause inflammation of the digestive tract in birds and interfere with nutrient absorption.  Exposure to oil toxins leads to anemia, damaged kidneys and livers and suppressed immune systems.  Oil toxins interfere with birds' ability to rid their bodies of excess salt, which is a crucial function for birds that rarely encounter fresh water.  Oil exposure causes decreased reproductive success, including lowered egg production, eggshell thinning, and reduced growth and survival of chicks.  Oil is toxic to small fish and marine invertebrates which are important food sources for piping plovers and many other bird species.

68.     Approximately 90% of the total U.S. population of piping plovers over-winters along the Gulf coast.  Piping plovers begin arriving on the Gulf coast in early July where they forage for invertebrates on beaches and in marshes.

69.     On October 14, 2010, the Deepwater Horizon Unified Area Command reported that 4343 visibly oiled birds, of which 2263 were dead, have been recovered in the Gulf since the Deepwater Horizon explosion. Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report (Oct. 14, 2010), *available at* http://www.restorethegulf.gov/fish-wildlife/fish-wildlife-reports.  The FWS reported that one piping plover has been among the dead birds recovered.  FWS, Bird Impact Data from DOI-ERDC Database Download 12 Oct. 2010 at 2 (Oct. 12, 2010) *available at* http://www.fws.gov/home/dhoilspill/collectionreports.html.  It is reasonably certain that more piping plovers have likely been killed and injured by the spill, but their bodies have not been recovered.

70.     Based on the location of the oil spill in relation to the habitat of the piping plover, it is reasonably certain that the release of oil into the Gulf of Mexico as a result of the Deepwater Horizon blowout has caused and will continue to cause the take of piping plovers.

       iv.    <u>Manatees</u>

71.     Florida manatees (*Trichechus manatus latirostris*) are a federally listed endangered species.  Although there is no precise estimate of the number of manatees using the Gulf waters affected by the oil spill, dozens of manatees move from Florida waters into nearshore and coastally connected waters in Texas, Louisiana, Mississippi, and Alabama during non-winter months.  Manatees forage, rest, and cavort in a variety of habitats and likely also carry out reproductive activities in these areas.

72.     As marine mammals, manatees regularly surface to breathe and are vulnerable to direct oil exposure and inhalation of toxic vapors associated with the oil.  Manatees are at risk from the ingestion of oil while foraging, which would seriously disrupt their digestion and cause acute ailments and chronic impairment of fitness and reproduction.

73.     Because the oil spill occurred when manatees are most widely distributed in the coastal waters of the northern Gulf, it is reasonably certain that the release of oil into the Gulf of Mexico as a result of the Deepwater Horizon blowout has caused the take of endangered manatees.  Furthermore, it is reasonably certain that take of endangered manatees will continue to occur as manatees migrate to and from Florida waters.

    **C.**    **Steps necessary to mitigate the ongoing take of endangered and threatened species.**

74.     The Deepwater Horizon blowout and the resulting massive oil spill in the Gulf of Mexico have caused and will continue to cause the take of endangered and threatened species.  Steps can be taken to directly and indirectly mitigate the impact of the oil spill on these species to facilitate

their continued survival and recovery in the region.  Such steps include, but are not limited to: (i) the rehabilitation of injured or debilitated wildlife; (ii) the recovery and removal of oil contamination from marine and coastal ecosystems; (iii) the restoration of ecosystem components destroyed or damaged by oil; (iv) the reduction and elimination of other threats to endangered or threatened species; (v) the establishment of a permanent endowment dedicated to the long-term restoration, maintenance, and scientific research of Gulf species and ecosystems; (vi) funding efforts to avoid or mitigate the adverse effects of other activities that cumulatively impact listed species in the Gulf; and (vii) the establishment of national marine sanctuaries, wildlife refuges or other protected areas.  This list is not intended to be exhaustive, and insuring the long-term survival and recovery of endangered and threatened species in the Gulf region in the wake of the Deepwater Horizon disaster will require these and many other steps.

## CLAIMS FOR RELIEF

### (Violations of the Endangered Species Act)

75.    Plaintiffs incorporate each of the foregoing allegations by reference as if fully set-forth herein.

76.    Section 9 of the ESA prohibits the "take" of endangered and threatened species.  See 16 U.S.C. §§ 1538(a)(1); 50 C.F.R. §§ 17.21, 17.31, 17.44(v), 223.205, 223.208.  BP has violated and continues to violate Section 9 of the ESA through its actions related to the explosion of the Deepwater Horizon drilling platform and the resulting massive oil spill.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendants have violated and continue to violate section 9 of the ESA, 16 U.S.C.§ 1538(a)(1)(B), by unlawfully taking endangered and threatened species as the result of

its conduct and actions concerning the Deepwater Horizon oil disaster and related clean-up efforts;

B.  Issue appropriate injunctive and other equitable relief to remedy Defendants' ongoing violations of the ESA.

C.  Award Plaintiffs their reasonable attorneys' fees and costs for this action pursuant to the ESA, 16 U.S.C. § 1540; and

D.  Grant Plaintiffs such other and further relief as may be just and proper.

Respectfully submitted this 20th day of October, 2010.

<div style="margin-left: 40%">

s/  John Suttles
John Suttles
Louisiana Bar No. 19168
SOUTHERN ENVIRONMENTAL LAW CENTER
200 West Franklin Street, Suite 330
Chapel Hill, NC 27516
Telephone: 919.967.1450
Facsimile: 919.929.9421
jsuttles@selcnc.org


Catherine M. Wannamaker
SOUTHERN ENVIRONMENTAL LAW CENTER
Georgia Bar No. 811077
Pro Hac Vice Application Forthcoming
127 Peachtree Street, Suite 605
Atlanta, GA 30303
Telephone: 404.521.9900
Facsimile: 404.521.9909
cwannamaker@selcga.org


Gregory Buppert
Tennessee Bar No. 024340
Michael Senatore
D.C. Bar No. 453116
Sierra B. Weaver
D.C. Bar No.  488560
DEFENDERS OF WILDLIFE

</div>

Pro Hac Vice Applications Forthcoming
1130 17th Street, N.W.
Washington, DC 20036-4604
Telephone: 202.682.9400
Facsimilie: 202.682.1331
gbuppert@defenders.org
msenatore@defenders.org
sweaver@defenders.org

*Counsel for Plaintiffs*


*Of counsel for Plaintiffs:*

Eric R. Glitzenstein
Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.   20009
Telephone: 202.588.5206
eglitzenstein@meyerglitz.com